**COASTAL DRYDOCK CORPORATION,**
Libelant,

v.

**UNITED STATES of America, as owner of THE STEEL TUG NO. 871,**
Respondent.

No. 19988.

United States District Court.
E. D. New York.

Jan. 28, 1958.

Foley & Martin, New York City, for libelant, by John H. Hanrahan, Jr., New York City, of counsel.

Cornelius W. Wickersham, Jr., U. S. Atty., for Eastern Dist. of New York, Brooklyn, N. Y., for respondent, by Walter L. Hopkins, Trial Atty., Dept. of Justice, New York City, of counsel.

BYERS, Chief Judge.

In this cause the libelant seeks a decree against the United States in personam, as owner of the Steel Tug No. 871, and the latter in rem, because on August 25, 1952 at about 8:00 P.M. that vessel caused damage to the drydock #2 and pier 3 in libelant's yard in Staten Island, the County of Richmond, within this district.

The facts of the striking of the drydock and damage to the pier are uncontested.

Nor is there any dispute concerning the antecedent events:

The tug was in the yard undergoing repairs pursuant to a contract (No. DA–182 T.C.–601) dated February 14, 1952 in evidence.

The specifications are dated July 14, 1952 and the work called for is "Annual Drydocking and Miscellaneous Repairs."

Included therein are about nine pages or more of what seem to be engine repairs.

Pertinent provisions contained in these documents are:

"Contract

\* \* \* \* \* \*

"Article 5(j)—If required by the specifications, the Contractor shall conduct dock and sea trials of the vessel. Such trials shall be carried out by the vessel's crew with representatives of the Contractor on board to check performance and satisfactoriness of operation. The Contractor shall be responsible for the care, installation and removal of instruments and apparatus furnished by the Government for such trials and shall provide and install all things and appliances necessary for such trials to enable the representatives of the Government to determine whether the requirements of the plans and specifications have been met."

"Article 5(p)—The Contractor shall exercise reasonable care and take all necessary or special precautions required to insure the safety of all employees, persons and property in and about the work, and to insure the safety of the vessel or portions thereof upon which work is done."

"Article 9(a)—The Contractor shall exercise reasonable care and use its best efforts to prevent accidents, injury or damage to all employees, persons and property in and about the work and to the vessel or portion thereof upon which work is done."

"Specifications

"Upon completion of all work, the Contractor shall thoroughly clean the interior of the engine, the Contractor shall thoroughly clean the interior of the engine oil pans and crank cases free of all sludge and dirt. The engine shall be properly assembled, adjusted and tested for four (4) consecutive hours at sea

trail (sic) run in the presence of U. S. Army Technical Inspector and Engine Manufacturers Service Engineer and all specified work shall be proven satisfactory to them." (Spec. 4.01, p. 17)

"All engine work in these specifications pertaining to the main engines and auxiliaries required to operate the main engines shall be completed two (2) calendar days prior to completion date in order to provide sufficient time for dock trials and test runs." (Spec. 4.01, p. 17).

The foregoing are found to impose upon libelant the duty of conducting a dock trial as preliminary to a four-hour sea trial.

This finding is important because the damage asserted by libelant was incurred as the result of a dock trial. That episode involved:

A. The mooring of the tug to pier 3, easterly side outshore, starboard side to.

B. The starting of the engines for a dock-test, with the tug so moored.

C. The carrying away of her mooring lines.

D. The onward movement of the tug into contract with drydock #2 about 30 to 40 feet to the southward, and damage to that structure.

The sole question for decision is whether responsibility for the damage is to be visited upon the respondent.

The tug had been moved from the drydock, and moored to the pier for about ten days prior to August 25, 1952. She was a steel tug about 85 feet long, beam 22 feet, equipped with diesel engines of 650 horsepower.

The foregoing elements of the situation as it developed, may be thus stated:

A. The mooring lines were of 5 or 6 inch manila rope, in good condition, and consisted of a bow, spring or breast, and a stern line. The bow line was single, the breast line triple, and the stern line double.

There is no dispute in the testimony concerning the foregoing, which otherwise would be stated as a finding.

B, C, and D. At about 8:00 P.M. of August 25, 1952, the dock trial was initiated by the starting of the engines, the personnel involved being:

*Naley*, chief engineer of the tug, was at the throttle and controlled the engine movements. He was an employee of the U. S. Army to which the tug was attached, ownership being in the Government.

The tug's log contains this entry: "Chief Engineer Naley allowed to stay on overtime for dock trial."

The following then in libelant's employ:

*Sadowski*, foreman (not now).

*Edwards*, machinist.

*Reid*, 2nd class machinist.

*Morrow*, oiler.

This gang went on board at around 7:00 o'clock and there was still work for them to do on the engines; when that was finished, Sadowski told Naley so, and then the latter operated the throttle so as to turn the engines over at low speed. It is not important to inquire as to the words used by the foreman, because in response to what he said the engines were put into forward movement, which is what Sadowski intended.

There is a conflict in testimony as to the interval which elapsed before the tug moved away from the pier, and struck the drydock.

Naley says it was about ten seconds, and that there was no delay in attaining 150 r. p. m., being slow speed—1 bell.

Sadowski and his men put the time elapsed at not less than five minutes.

The conflicting versions have to do with the action of the 6 cylinders, that is whether they began to function at once, or after an interval of time during which cylinders 1 to 5 inclusive were successively "bled" at the valves connecting the respective fuel lines thereto, in order to expel air from those lines which

had accumulated during the repair work on the engines.

The bleeding process was testified to by the men who conducted it, and which did not take place within the vision of Naley. They were convincing witnesses and their testimony is accepted. Naley's denial is merely that any such bleeding did not take place *to his knowledge.* (Italics added.)

Since it is hereby found that such bleeding did take place, it necessarily follows that it is also found that the interval between the initial throttle movement and the occasion of damage was not less than five minutes.

The immediate mechanical developments were that the tug surged forward under the impulse of her engine movement with the result that the bow line parted, the breast line exerted such pressure against its cleat that the latter's fastening bolts started from their holding nuts to such an extent that the cleat itself was substantially uprooted, and assumed such a leaning position that the spring or breast line rode over the horns of the cleat and thus ceased to hold the tug.

As to the stern line, it either parted or payed out to such an extent that the tug moved ahead to the floating drydock, and the contact caused the damage asserted by libelant. The testimony as to what happened to the stern line is not sufficiently clear to sustain a finding on that subject.

As to the bow and spring lines, the foregoing is to be deemed a finding.

Since the foregoing is not really disputed, the only question which survives an examination of the record, is whether there was negligence on the part of Naley in his handling of the throttle, and if so, to whom that conduct can be ascribed.

The testimony yields no conflict as to the number of r. p. m. enlisted when the engines are put into slow speed,—namely, 150. Nor is there any testimony that Naley ever moved the throttle into higher speed.

The only suggestion that he might have done other than he did, is that Sadowski stated that he noticed from his position alongside of Naley that the engine wasn't running right because "she must have had air in her lines" and he instructed Edwards to bleed them; and then:

"Q. Had you given the engineer any instructions as to whether to run the engine slow or fast or medium?

"A. Yes. When he said that it wasn't running, I told him there was air in the lines and I said, 'We will bleed it,' and I said, 'Watch the throttle, slow it down.' "

Since the throttle was then at slow speed (1 bell) it couldn't have been slowed.

If Sadowski meant to ask that power be shut off and the engines stopped, he could have said so, but did not.

The inference drawn by this court is that the bleeding was resorted to because the engines were turning sluggishly, in response to the initial throttle movement, and that the revolutions increased gradually as the fuel lines successively functioned as the air which had been trapped in them was released, and that finally, when cylinder 5 responded to the bleeding there was a surge of power, sufficient to turn the engines smoothly, but not in excess of the 150 r. p. m. of slow speed.

If there had been no air in the fuel lines, the initial thrust of the engines would have been at slow speed, and from this it is inferred that the tearing loose of the cleat, and the parting of the bow line, would have occurred at once instead of after the interval necessary to accomplish the bleeding.

It is the present opinion that the cleat was not equal to the strain put upon it by this dock trial, and once it let go and the spring line left it, the bow and stern lines were not equal to the task of holding the tug to the pier.

The respondent's exhibits A and B— photographs of the cleat taken August 26, 1952—reveal the infirmities of its

anchorage to the pier, due to the deterioration of the supporting timbers into which the holding bolts were supposed to be made fast.

Since the responsibility for conducting the dock trial was that of libelant, as set forth above, the decision to hold the tug in position alongside the pier for that purpose, (instead of head on, which was an available and approved method according to the record) the obligation extended to the capacity of the cleat to function as a holding element of the spring line.

In that respect the obligation was not performed, which means that libelant has failed to sustain its burden of proof.

Since this court is unable to find in the evidence, any support for the argument that Naley was negligent, it becomes unnecessary to discuss his precise legal status while he was in the control of the throttle.

Decree is directed dismissing the libel for failure of proof, with costs, to be settled on notice.